UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

BOUTUIVI AHLIN SANVEE,                                    CIVIL NO. 10-527 (RHK/JSM)

Plaintiff,

v.                                                       REPORT AND RECOMMENDATION

HENNEPIN COUNTY HUMAN SERVICES,

Defendant.

JANIE S. MAYERON, U.S. Magistrate Judge

The above matter came before the undersigned upon defendant's Motion for Summary Judgment [Docket No. 61]. Defendant's motion was decided on the papers in accordance with this Court's January 11, 2012 Order [Docket No. 72]. The matter was referred to the undersigned by the District Court for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b)(1)(B).

## I.    FACTUAL BACKGROUND[1]

On July 10, 2006, plaintiff Boutuivi Ahlin Sanvee ("Sanvee") became a permanent Human Services Representative ("HSR1") for defendant Hennepin County

---

[1]    This Court's January 11, 2012 Order gave plaintiff until February 13, 2012 to serve and file a response to defendant's motion for summary judgment. Plaintiff complied. However, without request or permission, on May 11, 2012, he also filed a 114-page Amendment to Reponses to the Memorandum of Law [Docket No. 80] along with additional exhibits [Docket No. 81], and on June 22, 2012, he filed a document entitled "Lexicon of the supplement of the evidences" [Docket No. 85], which is a collection of additional exhibits. Given that the May 11 and June 22 submissions were well past the deadline ordered by this Court and not permitted by the Court, it did not consider these submissions in conjunction with Hennepin County Human Services' motion for summary judgment.

Human Services ("HCHS").[2]  See Defendant Hennepin County's Memorandum of Law in Support of Motion for Summary Judgment [Docket No. 62], p. 2.  The essential job functions for the HSR1 position were in relevant part as follows:

> 1. Interact with clients and others to obtain information needed to determine eligibility and reviews new information for completeness.
>
> * * *
>
> 6. Respond to inquiries about case status.
>
> 7. Make appropriate referrals.
>
> 8. Present information about public assistance to providers and community groups.
>
> 9. Share knowledge with learn members and other staff.
>
> 10. Assist other county staff, both within and outside of the team, to help assure excellent client service.

See Def.'s Ex. 4 (Hennepin County Job Description for Human Services Representative 1 Position).

Terry L. Nyberg, the Human Services Supervisor for HCHS, had been Sanvee's supervisor since 2006.  See Affidavit of Terry L. Nyberg ("Nyberg Aff.") [Docket No. 64], ¶¶ 1-3.  Nyberg represented that in the past, Sanvee had been respectful and handled himself in a professional manner.  Id., ¶ 3.  Nyberg noted however, that in 2008, Sanvee began having interpersonal and communication problems with her and his co-workers. Id.  In January 2008, Sanvee had sent emails to Nyberg complaining that because of his supervisor, he had suffered "afflictions" to his employment rights and his right to human dignity.  See Sanvee's "Lexicon of the Exhibits" [Docket No. 77] ("Sanvee Ex."), 10

---

[2]      This Court notes that Sanvee's initial employment start date with HCHS was March 21, 2005.  See Supporting Exhibits for Defendants' Motion for Summary ("Def.'s Ex.") [Docket No. 68], Ex. 10 (Screenshot of Sanvee's Employment History).

(January 16, 2008 Email from to Tazzioli and Nyberg).  In early 2008, Sanvee reported interpersonal and communication problems he was having with co-workers and Nyberg to Lisa Groves, HCHS Program Manager in Eligibility Supports Units, including: (1) he believed that a former supervisor was sharing his medical records with staff; (2) he believed that a conversation in an elevator about someone turning 40 years old was aimed at his depression; (3) he took a casual remark about "recovering" to mean his particular recovery from a mental disorder; and (4) he believed that normal conversation and laughing around him was directed at him.  See Affidavit of Lisa Groves [Docket No. 63] ("Groves Aff."), ¶ 4.  In addition, Sanvee communicated to Groves on numerous occasions that he felt as though he was being discriminated against for being "mental disabled" and accused her of calling him a "mental disabled," which she denied.  Id., ¶ 5.  Groves investigated Sanvee's complaints and found them to be highly exaggerated or unfounded.  Id.  By April of 2008, Sanvee was making so many baseless complaints that Groves discussed with her manager about possibly disciplining Sanvee.  Id., ¶ 6.  Groves was concerned about Sanvee's behavior and felt that he needed help.  Id.  Groves believed that Sanvee's behavior and inability to see things rationally was progressively getting worse over time.  Id.

On April 9, 2008, Groves sent an email to a HCHS labor relations representative regarding disciplining Sanvee for making numerous baseless complaints.  See Govt. Ex. 5.  Groves acknowledged the difficulty in disciplining someone for baseless complaints, however, she noted that Sanvee had made allegations that included people talking about depression in the work place, stating that a team member threatened to beat him with a stick, claiming that a manager had passed around his medical records, and claiming that a co-worker called him "a mental disable" all of which were found to

be baseless.  Id.  According to Groves, the problem was that Sanvee believed that his concerns were valid, thereby making the situation even more difficult.  Id.

During a July 15, 2008 meeting that Nyberg, Sanvee and ten other HCHS attended, the purpose of which was to discuss case and policy issues with each other and assign daily tasks, Sanvee brought up a case for discussion, for which Nyberg had requested corrections to his work prior to this meeting.  See Nyberg Aff., ¶ 3. Sanvee became visibly agitated during the meeting and began to shout.  Id., ¶ 4; see also Affidavit of Charlita Holley[3] ("Holley Aff.") [Docket No. 65], ¶ 4.  Sanvee blamed other team members for the error that he had been asked to correct on his case, and was shouting at them stating that they should not deny it.  See Nyberg Aff., ¶ 4.  Nyberg repeatedly asked Sanvee to lower his voice and to clarify what his case question was, however, he continued to shout and state that "he would not be the subject of blame" and that he would show them that he would not allow team members to disrespect him and gossip about him.  Id., ¶ 6.  Nyberg again attempted to settle Sanvee down, but he continued to exhibit threatening body language, along with a raised voice.  Id., ¶ 7. Nyberg told Sanvee that they should discuss the case after the meeting and in private, but Sanvee ignored her, and then Nyberg called the meeting to a close.  Id.; Holley Aff., ¶ 4.

After the meeting was adjourned, Sanvee sat in front of the meeting room door, and no employees moved to leave the room.  See Nyberg Aff., ¶ 8.  Nyberg asked Sanvee to leave the room as the meeting had been adjourned and Sanvee then left the room visibly upset.  Id.; Holley Aff., ¶ 4.   Security was called and Sanvee was escorted

---

[3]     Charlita Holley is a Human Services Representative in the Eligibility Supports unit in the Human Services Public Health Department at Hennepin County.  See Holley Aff., ¶ 1.

out of the building.  See Nyberg Aff., ¶ 8.    Employees present at the meeting were upset after what had transpired and at least one expressed a concern for her safety. Id., ¶ 7; Holley Aff., ¶ 5.    The team as a whole filed a report under the County's Workplace Violence Policy, recounting the confrontation as set forth above, and noting that Sanvee was very unstable and that he might be ready to harm the team.  See Def.'s Ex. 6 (Incident Report).    The team asked for help for what they viewed as a possible threat to their safety.  Id.

After this incident, supervisors told Sanvee that before he could return to work, he needed to undergo a fitness-for-duty exam with a psychiatrist to make sure he was mentally fit to return to his job.  See Nyberg Aff., ¶ 9; Groves Aff., ¶ 8; Sanvee Ex. 14 (letter from Patricia Mack to Sanvee dated July 18, 2008).

On July 28, 2008, Sanvee underwent a fitness-for-duty examination with Dr. Dean Knudsen, M.D., Board Certified Psychiatrist, who prepared an initial report and then a subsequent more detailed report.  See Def.'s Exs. 7 (July 29, 2008 Report from Dr. Kean Knudsen, M.D.), 8 (August 1, 2008 Report from Dr. Kean Knudsen, M.D.). Sanvee reported to Dr. Knudsen that he had sickle cell anemia, he had been the target of an organized persecution by 15 of his coworkers, and he believed that his manager was telling people that he has AIDS and a mental disability.  Id.  Sanvee also indicated that the term "black mouth" had been used around him as a means of unintentionally insulting him.  Id.

Dr. Knudsen diagnosed Sanvee as follows:

> Axis I:      Probable schizophrenia, chronic paranoid type, with an exacerbation, 295.33.
> Rule out bipolar affective disorder, with psychosis, 295.54
> Rule out major depressive disorder with psychosis, 295.54

| Axis II: | Rule out organic psychosis related to a vascular or structural lesion.<br>Rule out schizoid or schizotypal traits |
|---|---|
| Axis III: | Reported history of sickle cell anemia; reported history of one-sided facial weakness, with visual changes, over a 30 day period |
| Axis IV: | Recent significant psychosis, potentially representing risk to himself or others. |
| Axis V: | GAF = 50.[4] |

Id., Ex. 8.

Dr. Knudsen explained his diagnosis as follows:

> Mr. Sanvee is psychotic. His judgment is significantly impaired. He lacks the emotional stability and judgment that would be necessary to work with a reasonable skill and perseverance, at this point. He is not capable of returning to his job as a Human Service Representative. He should be placed on a leave of absence for medical reasons, and should be strongly encouraged to seek psychiatric care and neurological care at once. He does pose a threat to his own health and safety, and the health and safety of others in his workplace, if he does return to his job.

Id., Exs. 7, 8.   In response to questions posed to him regarding Sanvee's ability to return to work, Dr. Knudsen found as follows:

> **1. In your medical opinion, is Mr. Sanvee able to return to his job as a Human Resource Representative 1 or should he be placed on a leave of absence for medical reasons?**
>
> Mr. Sanvee is not capable of returning to his job as a Human Service Representative. He should be placed on a leave of absence, due to medical reasons, immediately. He should be strongly encouraged to see a psychiatrist and a neurologist at once. He is actively psychotic.

* * *

---

[4]     "[T]he Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning.'"   Hudson ex.rel. Jones v. Barnhart, 345 F.3d 661, 662 n. 2 (8th Cir.2003) (quoting Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. Text Revision 2000) ("DSM–IV–TR")). A GAF score of 41–50 indicates serious symptoms and any serious impairment in social, occupational, or school functioning. DSM-IV-TR, 32.

**5. If Mr. Sanvee is able to return to work, are there any recommended adjustments the employer should make to assist him in improving his ability to interact with his supervisors and peers?**

He is not capable of a return to work. No adjustments are possible, at this point, that would improve his ability to work with his supervisors and peers in a fashion consistent with a minimal degree of safety and productivity. He will very likely remain impaired, and unable to work until his psychosis is treated.

Id., Ex. 8 (emphasis in original).

On September 5, 2008, HCHS placed Sanvee on Medical Leave Without Pay. Def.'s Ex. 9, p. 1 (February 15, 2009 Change in Employment Status Letter to Sanvee from Hennepin County).  When he did not return to work within the requisite 180-day period, because he could not establish psychological fitness in that time frame, he was placed on Medical Layoff on March 5, 2009.  Id.  The layoff notice stated that if, "by the conclusion of your Medical Layoff period (11/14/2011)—you do not contact Lori Olsen with sufficient notice for the County to obtain additional medical as may be necessary, your employment with the County will formally end on 11/15/2011 without any further notice from the County."  Id.  The additional medical information referenced in the layoff notice included written documentation from a physician that confirmed his ability to work, along with any limitation to work.  Id.

Hennepin County did not receive any medical documentation from Sanvee and his medical lay-off expired on November 14, 2011.  Accordingly, he was deemed terminated from employment at that time.  See Grove Aff., ¶ 9; Def.'s Ex. 10 (Screenshot of Sanvee's Employment History).

On April 30, 2009, Sanvee filed and administrative charge with the Equal Employment Opportunity Commission ("EEOC") in which he claimed discrimination based on race, retaliation and disability.  See Def.'s Ex. 1.

The particulars of that charge were as follows:

> I. I have been continuously harassed by my coworkers and managers at the above stated Respondent. I have complained on multiple occasions over several years, and the hostile and intimidating Work environment continued. I complained about coworkers stating I had mental illness and asking "are you recovered now?" I complained about a coworker stating there are slaves in Africa and I should be happy to be here and my Supervisor responding "we do a lot for them but they never notice." I complained about my Supervisor physically attacking me. On July 15, 2008, I was sent home and told I had to take a "fitness for duty" exam to return to work. I took the exam on July 28, 2008, and I was notified that I was placed on an involuntary medical leave in early August 2008. Since that time, I have applied for other jobs, and I believe the Respondent has given poor references.
>
> II. Respondent's Reason Given: I was told that I had threatened people, but when I asked what I had said, nobody could tell me.
>
> III. I believe that I have been discriminated against on the basis of a perceived disability, race/Black, national origin/Togo and in retaliation for making multiple complaints in violation of Title I of the Americans with Disabilities Act of 1990 and Title VII of the Civil Rights Act of 1964, as amended.

Id.

On November 25, 2009, the EEOC closed its file on Sanvee's Charge, finding that it was "unable to conclude that the information obtained established violations of the statutes." Id., Ex. 2.

On February 24, 2010, Sanvee filed the present suit in federal court.  On July 1, 2011, Sanvee filed the operative Amended Complaint [Docket No. 49].  In it, he

asserted claims under (1) Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e) ("Title VII") for employment discrimination on the basis of race, national origin and disability; (2) the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101) ("ADA") for employment discrimination on the basis of disability; and (3) the Equal Pay Act ("EPA") for being underpaid for a position as an interpreter, for being required to work for more than eight hours a day with payment for only six hours a day, and for requiring him to take a mental health test and making results full of "impositive."  Id. at pp. 2-3. Sanvee alleged that this discrimination took place from June 2005 to August 2008.  Id., p. 3.  Sanvee indicated that the conduct complained of in the suit included: "failure to hire;" "terms and conditions of employment different from those of similar employees;" "harassment;" "employer had obtained my entire medical records, disclosed it at my workplace and told my colleagues that I had HIV, mental health; harassment through phone calls; attempt of physical assault; arbitrary closure of [his] COBRA (Medical insurance with the former employer)."  Id., p. 4.  Sanvee stated that he had not complained about this same conduct in the EEOC charge.  Id.

In support, Sanvee alleged the following claims:[5]

(1) On June 21, 2005, Jillian Middlebrooks forced him to sign a medical request form even though he was suffering immense pain relating to his sickle cell anemia.  Id.,

---

[5]      This Court notes that the Amended Complaint [Docket No. 49] incorporates 6 of the 7 pages of the original Complaint, which includes a numbered paragraph 10 setting forth the factual basis of his claims (pp. 5-6 of Docket No. 49).  However, Sanvee substituted paragraph 10 of the Complaint with a new paragraph 10 in the Amended Complaint that sets forth facts related to nine claims.  See Amendment of the Pleadings and Supplementary Claims, pp. 8-17 [Docket No. 49].  Thus, the Court has treated the factual allegations in the Amendment of the Pleadings and Supplementary Claims as the operative supporting facts and does not consider those listed in paragraph 10 on pages 5-6 of the Amended Complaint.  Further, to the extent that this Report and Recommendation refers to certain numbered claims (e.g. Claim 1), the Court is referencing one of the nine claims set out in Amendment of the Pleadings and Supplementary Claims, pp. 8-17 [Docket No. 49].

p. 8.  Middlebrooks later took his entire medical file without any envelope and put it on his desk with several pages of materials titled, "Basic Fact about HIV and AIDS."  Id., p. 9.  Sanvee asserted that these actions violated the Health Insurance Portability and Accountability Act ("HIPAA"), "usurpation of a form" to obtain his medical records, a violation of unnamed federal and Minnesota law prohibiting the disclosure of an individual's medical records, and "traffic of signature."  Id., pp. 8-9.

(2) In 2004, Middlebrooks told people around the office that Sanvee suffered from HIV when he actually did not.  Id., p. 10.  Further, his colleagues had been mocking him as being HIV positive and mentally disabled until the month that he had been "expelled" from work.  Id.  The violation alleged by Sanvee based on these facts was that by perceiving Sanvee as HIV positive and mentally disabled, and divulging those false rumors about him, Middlebrooks violated the ADA.  Id.  Sanvee also claimed that because he was perceived as mentally disabled, HCHS refused to hire him, even though it was hiring new employees outside of Hennepin County.  Id., p. 13.

(3) From August 2005 to July 2006, HCHS employed him for 10 or 11 hours per day but only paid him for 6 hours per day; decreased his wages from $12 to $9 per hour despite the fact that he was doing the same amount of work; did not pay him for his work as a French interpreter for HCHS; refused him a whole day's worth of pay because he had to leave at 4:30 p.m. due to a complication with his sickle cell anemia; refused to hire him because he was perceived to be mentally disabled; and required him, along with other colleagues, to help Middlebrooks move into a new house.  Id., pp. 11-12. According to Sanvee, these actions amounted to involuntary servitude in violation of: the Thirteenth Amendment to the Constitution, the Fourteenth Amendment, the Fair Labor Standards Act ("FLSA"), the EPA, and federal anti-slavery laws.  Id., p. 12.

(4) After Middlebrooks saw a copy of Sanvee's HIV test, she called him "my fiancé," engaged in undesirable touching (including "strong hugs"), and when he did not return Middlebrooks' affections, she made remarks regarding his mental health, his sexuality and continued her unwanted advances. Id., p. 13. Middlebrooks also told colleagues that Sanvee was gay. Id. In retaliation for his refusal to yield to her sexual advances, Sanvee claimed he experienced wage decrease, increased workloads and undesirable assignments, and that Middlebrooks told people he was gay (which he was not) only because he refused sexual advances. Id. This conduct continued through the last months of his employment and amounted to sexual harassment. Id., p. 14.

(5) Sanvee brought a claim under the ADA because he was "insulted that I was supposed to be on medical coverage for disabled persons, instead of working at Hennepin County (2007)." Id.

(6) Sanvee was "insulted that there is slavery in Africa and he should be happy I was in America" to which his supervisor (unnamed) replied "[w]e do a lot for them but they never notice." Id. Sanvee was also insulted in 2008 that "he smelled bad." Id. Sanvee claimed that this conduct amounted to discrimination on the basis of national origin discrimination and a "violation of my human dignity." Id.

(7) Sanvee claimed an unnamed supervisor physically assaulted him, which was a violation against his person. Id.

(8) Sanvee's supervisor, Nyberg, requested that he work overtime but he refused because he would not attend a nonmandatory employee breakfast as he wanted to avoid insults. Id., p. 15. Additionally, Nyberg would not pay Sanvee for bilingual work, despite the fact that he took the interpreter test. Id. This conduct violated the EPA, the FLSA and the Fourteenth Amendment. Id.

(9) Sanvee was "frequently insulted" that he was bipolar, bisexual, "mental disable," HIV positive and schizophrenic.  Id.  Despite the fact that he was capable of working and respectful to his co-workers, he had not received a wage promotion.  Id.  While Sanvee complained to his managers and human resources, nothing was done and instead, he was coerced into a prohibited psychiatric evaluation by a psychiatrist who mocked him.  Id., pp. 15-16.  He requested vacation in order to obtain legal advice, which was denied and he was forced to undergo the psychiatric evaluation, which included harassing telephone calls from his program manager that he needed to attend the psychiatric evaluation.  Id., p. 16.  All of this occurred despite the fact that he had requested leave due a sickle cell anemia crisis.  Id., p. 16.  Sanvee asserted that this conduct amounted to a violation of the Family Medical Leave Act ("FMLA"), given that has provided his supervisor with a report from his primary doctor that he had sickle cell anemia and need of sick leave; a violation of his right of domestic tranquility under the preamble of the Constitution of the United States and "harassment through telephonic calls;" "[f]raudulent medical records forged on my behalf and divulged to other people outside the Hennepin County;" and "feasting" by his managers upon his "Life, Liberty and the Pursuit of Happiness" under the Declaration of Independence.  Id., pp. 16-17.

As relief, Sanvee asked for this Court (1) for strict application of American laws for prosecuting his employer in order to set an example as to other employers; (2) to reinforce the labor law and restore the value of "Human Person and Human Principle" in the Hennepin County Human Services; and (3) for payment and repair to the resulting damage to his life.  Id., p. 17.

The present matter is before the Court on HCHS's Motion for Summary Judgment.

## II.    STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986); see also Unigroup, Inc. v. O'Rourke Storage & Transfer Co., 980 F.2d 1217, 1219 (8th Cir. 1999).  "[S]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex, 477 U.S. at 327.  "'Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" DePugh v. Smith, 880 F. Supp. 651, 656 (N.D. Iowa 1995) (quoting Anderson, 477 U.S. at 248).

The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed.  Celotex Corp., 477 U.S. at 322-23; see also Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000).  If the moving party has carried its burden, the non-moving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  Anderson, 477 U.S. at 256; Krenik v. County of LeSueur, 47 F.3d 953, 957 (8th Cir. 1995).  "The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial." Minnesota Laborers Health & Welfare Fund v. Swenke, 2003 WL 21521755 *1 (D.Minn. July 2, 2003) (citations omitted).  The non-moving party "must substantiate his allegations with sufficient probative evidence that would permit a

finding in [their] favor based on more than mere speculation, conjecture, or fantasy." Wilson v. Int'l Bus. Mach. Corp., 62 F.3d 237, 241 (8th Cir. 1995).

Summary judgment is appropriate where the material facts are not in dispute, and the court need only apply the law to the facts in the record. See Eisenrich v. Minneapolis Retail Meat Cutters, 282 F. Supp. 1077, 1080-81 (D. Minn. 2003) (citing Oldham v. West, 47 F.3d 985, 988 (8th Cir. 1995)).

## III.   ANALYSIS

HCHS has a brought a motion for summary judgment arguing that Sanvee cannot establish a prima facie case of race or disability discrimination as forth in his Amended Complaint; Sanvee cannot produce evidence of pretext based on its nondiscriminatory reasons for requiring him to undergo a psychiatric evaluation and ultimately terminating his employment due to his mental health; any Title VII retaliation claim fails because he gave no notice in the EEOC charge as to what acts were deemed retaliatory and the undisputed evidence shows that the concern for Sanvee's mental health prompted the fitness-for-duty exam and his ultimate medical layoff; Sanvee's ADA claims fail on the basis that he was not qualified to perform the essential functions of his position as outlined by Dr. Knudsen's report and on the basis that it had a legitimate basis to order a fitness-for-duty examination due to his threatening behavior towards coworkers.   See Defendant Hennepin County's Memorandum of Law in Support of Motion for Summary Judgment [Docket No. 62] ("Def.'s Mem.").  In addition, HCHS submitted that Sanvee had failed to exhaust his administrative remedies with the EEOC with regards to his claim that Jillian Middlebrooks compelled him to sign a medical report request form in 2005; claims regarding sexual abuse, sex discrimination or sexual harassment by Middlebrooks in 2005; claims under HIPPA; claims related to

HIV; violations of the Thirteenth Amendment of the Constitution, the EPA, the FLSA, the Federal Anti-Slavery Law, human dignity, and the FMLA; and allegations regarding Sanvee's medical records.  Id.

Sanvee filed a Response to the Summary Judgment [Docket No. 75] ("Pl.'s First Resp.") and a Response to the Memorendum [sic] of the Law [Docket No. 76] ("Pl.'s Second Resp.").   In his first response, Sanvee discussed unrelated allegations that a HCSC attorney has engaged in a conspiracy with "PERA" workers to delay his retirement refund; he has lost his apartment and been homeless for a year; despite his condition and situation, Hennepin County did not assist him and refused provide him public assistance; HCSC has interfered with his ability to obtain employment elsewhere; "through the monastery of holocaust that the Defendant has interned" him, he has developed blood clots, hypertension, pulmonary embolism and suffered a stroke; and HCSC failed to give proper training as to the requirements of HIPAA and instead of remedying its mistakes, has victimized him.  See Pl.'s First Resp.

In Sanvee's second response, he argued that he had sufficiently established a prima facie case of discrimination under the ADA for the following reasons: because Middlebrooks told other employees that he was schizophrenic, bipolar and has HIV, he was isolated by his coworkers; because he was perceived to be bipolar, schizophrenic and have HIV, Hennepin County refused to employ him as a full-time employee, promote him and deprived him of a job he for which he was interviewed and hired; and he was put on healthcare for disabled people and hours after that decision was made, an email was sent out about schizophrenia and his co-workers mocked him.  See Pl.'s Second Resp., pp. 2-4.  The balance of the Response dealt with the merits of his claims under the EPA, the FLSA, the FMLA and COBRA Id., pp. 4-8.  Sanvee also claimed that

a Dr. Hill Geoffery found that he was not suffering from schizophrenia, did not pose danger to anyone nor to himself, and there was no evidence that he has paranoiac or had delusional thoughts. Id., p. 8.  A second opinion by an unnamed psychiatrist nurse also allegedly mentions the same diagnosis. Id.  These reports and opinions were not provided to the Court.

### A.   Civil Rights Act Title VII Discrimination Claim[6]

HCHS argued that any Title VII discrimination claim against it should be dismissed on the following grounds: (1) there is no direct evidence of discrimination; (2) Sanvee does not meet the requirement that he is qualified for his job in order to establish a prima facie case of discrimination; (3) even assuming that Sanvee could establish a prima facie case, the fact that he was a danger to himself and others provided a legitimate and non-discriminating reason for placing Sanvee on medical leave and ultimately terminating him; and (4) Sanvee provided no evidence that this proffered reason was false or that he was fired because of his nationality or race. See Def.'s Mem., pp. 8-11.  Sanvee provided no direct response to HCHS's arguments in either of his two briefs nor did he provide any evidence in support of his discrimination claim, which is covered in Claim 6 of the Amended Complaint.

Title VII prohibits employment discrimination on the basis of race or national origin. 42 U.S.C. § 2000e–2(a).  Where, as here, there is no direct evidence that Sanvee was terminated because of his race or national origin, this Court must apply the McDonnell Douglas burden-shifting framework.  Pursuant to this framework, a plaintiff initially has the burden to establish a prima facie case of discrimination, which creates a

---

[6]     HCHS also argued that Sanvee's claims under the Minnesota Human Rights Act ("MHRA") should also be dismissed. See Def.'s Mem., p. 14.  However, Sanvee did not assert any MHRA claims in the Amended Complaint.  Thus, no such claims are before the Court.

rebuttable presumption of discrimination.  See Pye v. Nu Aire, Inc., 641 F.3d 1011, 1019 (8th Cir. 2011).  If a plaintiff makes out a prima facie case, the burden then shifts to the defendant to provide a legitimate, nondiscriminatory reason for its decision.  Id.  If the defendant provides such a legitimate, nondiscriminatory reason, the presumption of discrimination disappears, and the burden shifts back to the plaintiff to show that the proffered reason for the employment action was pretext for discrimination.  Id. (citation omitted).

Under McDonnell Douglas, [plaintiff] must first establish a prima facie case of discrimination: 1) [he] is a member of a protected group; 2) [he] was qualified for [his] position; 3) [he] suffered an adverse employment action; and 4) [he] was discharged under circumstances giving rise to an inference of discrimination."  Wierman v. Casey's Gen. Stores, 638 F.3d 984, 993 (8th Cir. 2011) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 879 (1973)); see also Pye, 641 F.3d at 1019 (citing Wierman, 638 F.3d at 993) ("To establish a prima facie case of discrimination, a plaintiff must show (1) he is a member of a protected class, (2) he met his employer's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination.").

The Court concludes that Sanvee has failed to make out a prima facie case of discrimination.  First, the essential job functions for Sanvee's position required him to communicate and interact with the other Hennepin County employees and the public, and to provide assistance to others.  See Def.'s Ex. 4 (Hennepin County Job Description for Human Services Representative 1 Position).  HCHS based its actions on the report and opinions of Dr. Knudsen, which provided that Sanvee was "actively psychotic;" he posed a "threat to his own health and safety, and the health and safety of

others;" he would "very likely remain impaired, and unable to work until his psychosis is treated;" and his "chronic psychosis causes him to misinterpret simple statements made by others around him." Id., Exs. 7 (July 29, 2008 Report from Dr. Kean Knudsen, M.D.), 8 (August 1, 2008 Report from Dr. Kean Knudsen, M.D.).  Given this assessment, it is evident that Sanvee was not qualified to perform his position, which expressly required him to interact with others and to assist other county staff, both inside and outside his team.[7]  This evidence, coupled with the undisputed fact that Sanvee never provided HCHS with any medical documentation or support that he was fit for employment before the date of his termination, is clear evidence that he could not meet his employer's legitimate expectations or that he was qualified for his position.[8]

Moreover, even if Sanvee had submitted any evidence to make out a prima facie of discrimination (which he did not), based on the unrebutted report of an independent physician, Dr. Knudsen, HCHS provided a legitimate, nondiscriminatory reason for Sanvee's dismissal, for which Sanvee provided no evidence to suggest that this reason was a pretext.

To the extent that Sanvee is asserting a hostile work environment claim (which it is not at all clear that he is asserting), the Court finds that that HCHS's motion for

---

[7]     As stated previously, Sanvee claimed that a Dr. Hill Geoffrey found that Sanvee was not suffering from schizophrenia, did not pose danger to anyone nor to himself, and there was no evidence that he has paranoiac or had delusional thoughts.  See Pl's Second Resp., p. 8.  He also referred to a second opinion by a psychiatrist nurse also allegedly mentioned the same diagnosis.  Id.  These reports and opinions were not provided to the Court as part of his February 2012 submissions and therefore, Sanvee's description in his brief cannot be considered in opposition to HCHS's motion.

[8]     This Court notes that Sanvee submitted the Affidavit of Mame Samba Fall, a co-worker at HCHS, who claimed that Sanvee was a caring person and that his health condition enabled him to professionally perform his work duties for Hennepin County.  See Sanvee Ex. 2, ¶ 6.  However, Samba Fall only worked at Hennepin County until 2006, and the events at issue transpired in 2008 through 2011.  Id., ¶ 1.

summary judgment under Title VII should be granted on this claim, as well.  In order to establish a Title VII race-based hostile work environment claim, a plaintiff must show "(1) he is a member of a protected group, (2) he is subjected to unwelcome race-based harassment, (3) the harassment was because of his membership in the protected group, and (4) the harassment affected a term, condition, or privilege of his employment." Carpenter v. Con-Way Cent. Express, Inc., 481 F.3d 611, 617-18 (8th Cir. 2007) (citing Singletary v. Mo. Dep't of Corr., 423 F.3d 886, 892 (8th Cir. 2005)).  A hostile work environment "'is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment' as viewed objectively by a reasonable person." Id. at 618 (quoting Tademe v. Saint Cloud State Univ., 328 F.3d 982, 991 (8th Cir. 2003)).  However, "[a]llegations of a few isolated or sporadic incidents will not suffice; rather, the plaintiff must demonstrate the alleged harassment was 'so intimidating, offensive, or hostile that it poisoned the work environment." Id. (citation and marks omitted).

Here, the only allegation of racial animus or animus based on national origin was the one occasion where an unnamed co-worker allegedly stated that there were still slaves in Africa, Sanvee should be happy to be in the United States, and his unnamed supervisor's response that "we do a lot for them but they never notice.[9] See Amended Complaint, p. 14; Def.'s Ex. 1 (Plaintiff's Charge of Discrimination).  Sanvee has provided no evidence that such statements were made, much less who made them. But even if he had, one isolated instance cannot does not make out a hostile work environment claim.

---

[9]    The allegation that someone told Sanvee he smelled bad does not contain any additional information suggesting that it was made with regards to his ethnicity or race.

For all of these reasons, HCHS's motion for summary judgment as it relates to Sanvee's Title VII claims, as set forth in Claim 6 of the Amended Complaint should be granted and that the claims should be dismissed with prejudice.

**B.    Title VII Retaliation Claim**

In Claim 9 of the Amended Complaint, Sanvee asserted that HCHS retaliated against him for making claims of discrimination by subjecting him to a coerced psychiatric evaluation and making it look like he had schizophrenia.  HCHS argued that any Title VII retaliation claim fails because he gave no notice in the EEOC charge as to what acts were deemed retaliatory.  See Def.'s Mem., p. 12.   In addition, HCHS asserted that even if Sanvee had established a prima facie claim, email records show that the concern for Sanvee's mental health prompted the fitness-for-duty exam. Id., p. 13.  Thus, HCHS claimed it had legitimate nondiscriminatory reasons for placing him on a medical layoff and its decision to do so was not retaliatory. Id.  In his submissions to the Court, Sanvee did not address HCHS's arguments at related to his retaliation claim.

"Title VII prohibits retaliation against employees who allege, or participate in an investigation or proceeding alleging, a violation of Title VII by his or her employer." Weger v. City of Ladue, 500 F.3d 710, 726 (8th Cir. 2007) (citing 42 U.S.C. § 2000e–3(a)).  To prevail on a retaliation claim, a plaintiff must first establish a prima facie case by showing: "(1) [he] engaged in protected conduct; (2) reasonable employees would have found the challenged retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct." Id. (citations omitted).  To establish a causal connection, plaintiffs must present evidence that gives rise to an inference of retaliatory motive. See Kipp v. Mo. Hwy. & Trans. Comm'n, 280 F.3d 893,

897 (8th Cir. 2002) (citations omitted).  If a plaintiff establishes a prima facie case, the defendant must advance a legitimate reason for its challenged behavior, and if the defendant advances such a reason, then the plaintiff must produce evidence demonstrating that the defendant's reason is pretext for unlawful discrimination.  Reico v. Creighton Univ., 521 F.3d 934, 938-39 (8th Cir. 2008) (citation omitted).

Assuming that Sanvee has made out a prima facie case of retaliation (i.e., he is a member of a protected class; his complaints to Nyberg constituted protected conduct; and his termination was causally connected to that protected conduct), the undisputed evidence before this Court is that the decision to require Sanvee to undergo a fitness-for-duty exam to insure that he was mentally fit to return to his job was due to the altercation during the July 28, 2008 meeting with his coworkers and the prior interpersonal and communication problems he had with supervisors and co-workers that led to the filing by him of baseless complaints.  The decision to place him on medical leave and the final termination was then based on the report of Dr. Knudsen, which set forth that Sanvee was suffering from psychosis and that he posed a threat to himself and others, and Sanvee's failure to subsequently provide medical evidence demonstrating that he was fit for work.  On this record, the Court finds that HCHS had legitimate and non-retaliatory reasons for requiring him to undergo the evaluation and ultimately terminating his employment, and Sanvee has not presented in any evidence to establish that these reasons were a pretext.  Therefore, the Court finds that HCHS's motion for summary judgment as it relates to Sanvee's retaliation claim, as set forth in Claim 9 of the Amended Complaint, should be granted and that the claim dismissed with prejudice.

C.   __ADA Claims__

The ADA prohibits discrimination against a qualified employee with a disability because of that employee's disability.   See 42 U.S.C. § 12112(a).   Sanvee's ADA claims are split into allegations of a hostile work environment based on being allegations that colleagues mocked him for being mentally disabled (Claim 2); discrimination based on his perceived HIV positive status (Claim 2); HCHS's refusal to hire him despite the fact that it was hiring new employees outside of Hennepin County, because it perceived him as a "mental disabled" (Claim 3); insults that he was supposed to be on medical coverage for disabled persons instead of working (Claim 5); and the requirement that he undergo an unwarranted mental examination (Amended Complaint, p. 5, ¶ 3(e)).[10]

HCHS argued that it is entitled to summary judgment on Sanvee's ADA claims, on the basis that he was not qualified to perform the essential functions of his position as set forth in Dr. Knudsen's report and on the basis that it had a legitimate basis to order a fitness-for-duty examination based on his threatening behavior to coworkers. See Def.'s Mem., pp. 14-15.   Sanvee claimed that he has sufficiently established a prima facie case of discrimination under the ADA.   See Pl.'s Second Resp., p. 4.   As best as this Court can discern, Sanvee asserted in his response that Middlebrooks told his colleagues that he was bipolar and had schizophrenia, and as a result, his colleagues isolated him.   Id., p. 2.   He also argued that because of his perceived mental disability, Hennepin County refused to employ him as a full-time employee, promote him

---

[10]    Because Sanvee did not raise with the EEOC any claim related to his perceived HIV positive status, or any claim regarding being insulted that that he was supposed to be on medical coverage for disabled persons instead of working, any such claims are barred for a failure to exhaust administrative remedies for the reasons set forth below and will not be addressed in this section. See infra, section III(F).

and deprived him of a job for which he was interviewed and hired.  Id. (citing Sanvee Exs. 3, 4 (Letters from Hennepin County to Sanvee in 2005 Pertaining to Job Applications)).   In addition, Sanvee contended that he was put on healthcare for disabled people and hours after that decision was made, an email was sent out about his schizophrenia and his co-workers were mocking him.  Id., p. 3 (citing Sanvee Exs. 6 (Test Results from French Language Proficiency), 7 (Sanvee Pay Stubs)).

To prevail on a hostile work environment claim under the ADA, Sanvee must show "'that he is a member of the class of people protected by the statute, that he was subject to unwelcome harassment, that the harassment resulted from his membership in the protected class, and that the harassment was severe enough to affect the terms, conditions, or privileges of his employment.'" Ryan v. Capital Contractors, Inc., 679 F.3d 772 (8th Cir. 2012) (quoting Shaver v. Indep. Stave Co., 350 F.3d 716, 720 (8th Cir. 2003), citing Reedy v. Quebecor Printing Eagle, Inc., 333 F.3d 906, 907-08 (8th Cir.2003)).  Further, when the alleged harasser is the plaintiff's fellow co-workers," there is a fifth element: that the employer knew or should have known of the harassment and failed to take proper action."   Id. (citing Palesch v. Mo. Comm'n on Human Rights, 233 F.3d 560, 566 (8th Cir. 2000)).

Sanvee pointed to exhibits to support his assertion that an email was sent out about schizophrenia and he was subsequently mocked by his co-workers.   However, these exhibits address Sanvee's test results pertaining to French language proficiency and his pay stubs.  Id., p. 3 (citing Sanvee Exs. 6 (Test Results from French Language Proficiency), 7 (Sanvee Pay Stubs)).[11]

---

[11]     This Court also notes that in his list of exhibits [Docket No. 77], Sanvee claimed that Exhibit 9 shows that he was placed on "waiver services" for his schizophrenia and HIV, however, Exhibit 9 is a paycheck to Sanvee.  Similarly, while Sanvee described in

In sum, other than these exhibits, which do not provide any evidence of a hostile work environment based on a mental disability, Sanvee's unsubstantiated alleged in the Amended Complaint and his memorandum of law, do not amount to competent evidence demonstrating that he was subject to unwelcome harassment based upon his mental health.  See Computer v. Equus Computer Sys. of Missouri, Inc., 162 F.3d 991, 997 (8th Cir. 1998) ("Summary judgment is appropriate where there is no independent evidence, other than the petitioner's unsubstantiated allegations.") (citing Davenport v. Riverview Gardens Sch. Dist., 30 F.3d 940, 945 (8th Cir. 1994)); Hill v. St. Louis Univ., 123 F.3d 1114, 1119 (8th Cir. 1997) (affirming grant of summary judgment to defendant employer and noting that plaintiff's "claims of falsified job performance evaluations are unsupported allegations not competent to defeat summary judgment."). Where, as here, Sanvee has provided no competent evidence that he was subject to unwelcome harassment based on his mental disability, HCHS's motion for summary judgment as to any ADA hostile work environment claim should be granted and the claim should be dismissed with prejudice.

As for requiring Sanvee to undergo a fitness-for-duty examination, HCHS can have no liability under the ADA if it can demonstrate it there was a business necessity for the medical examination, which a court will find if an employer can identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his duties.  See Thomas v. Corwin, 483 F.3d 516, 528 (8th Cir. 2007) (citation omitted); see also Cody v. CIGNA Healthcare of St. Louis, Inc., 139 F.3d 595, 599 (8th Cir. 1998) ("Employers

---

his exhibit list that Exhibit 10 was an email that had been sent out after the meeting regarding "waiver services" and showed that he was mocked by his colleges, Exhibit 10 only pertains to emails that Sanvee sent asking to meet with someone to air grievances against his supervisor and Groves agreeing to meet with him.

need to be able to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims under §§ 12112(a). . . .").

As stated previously, the requirement that Sanvee had to undergo a fitness-for-duty exam with a psychiatrist to determine if he was mentally fit to return to his job, was based on the July 28, 2008 altercation his co-workers and the previous interpersonal and communication problems with supervisors and co-workers including baseless complaints against them. Based on this conduct, the Court finds that fitness-for-duty mental exam was necessary to determine whether Sanvee could safely interact with coworkers and the public, which was necessary element of his job. Therefore, the Court finds that the examination requirement was legitimate and based on non-discriminatory reasons.

The Court also finds that Sanvee does not have a viable ADA claim regarding HCHS's refusal to hire him. A plaintiff seeking relief for such a claim under the ADA must show "(1) he is a disabled person as defined by the ADA, (2) he is qualified to perform the essential functions of his job with or without reasonable accommodation, and (3) he suffered an adverse employment action because of his disability." St. Martin v. City of St. Paul, 680 F.3d 1027, 1032 (8th Cir. 2012) (citing Lors v. Dean, 595 F.3d 831, 834 (8th Cir. 2010)). Assuming that Sanvee is a disabled person under the ADA, he has presented no evidence to establish that he was qualified to perform the essential functions of his job with or without reasonable accommodation. HCHS refusal to return Sanvee to work (or to rehire him, as alleged by Sanvee) was based its actions on the report of Dr. Knudsen, which provided that Sanvee was "actively psychotic," posed a threat to his own health and safety and those of others, was "very likely remain impaired, and unable to work until his psychosis is treated," and his "chronic psychosis

causes him to misinterpret simple statements made by others around him." <u>Id.</u>, Exs. 7, 8. These opinions, combined with the undisputed fact that Sanvee never provided HCHS with any medical documentation that he was fit for employment, leads this Court to find that Sanvee could not meet his employer's legitimate expectations and was not qualified to perform any position for HCHS.

For all of the reasons stated above, HCHS's motion for summary judgment as it relates Sanvee's ADA claims of a hostile work environment based on being mocked by his colleagues for being mentally disabled (Claim 2); HCHS's refusal to hire him despite the fact that it was hiring new employees outside of Hennepin County, because they perceived his as a "mental disabled" (Claim 3); and being required to undergo a prohibitive mental examination (Amended Complaint, p. 5, ¶ 3)(e)) should be granted and these claims should be dismissed with prejudice.

### D.   HIPAA/Medical Document Claims

Sanvee's HIPAA claims surround the allegations that on June 21, 2005, Jillian Middlebrooks forced him to sign a medical request form and obtained his medical files. <u>See</u> Amended Complaint, pp. 8-9. However, because "HIPAA does not create a private right, it cannot be privately enforced either via § 1983 or through an implied right of action." <u>Adams v. Eureka Fire Protection Dist.</u>, 352 Fed. Appx. 137, 139 (8th Cir. 2009) (string citation omitted); <u>see</u> <u>also</u> <u>Acara v. Banks</u>, 470 F.3d 569, 571 (5th Cir. 2006) ("[W]e are not alone in our conclusion that Congress did not intend for private enforcement of HIPAA."); <u>Nelson v. Hennepin County Medical Center</u>, Civ. No. 06-1865 (DWF/SRN), 2007 WL 2695647 at *1 n. 2, (D. Minn. Sept. 11, 2007) ("At the motion hearing and in response to defendants' arguments that there is no independent HIPAA cause of action, Nelson explained that she was using HIPAA as a basis for setting the

standard of care for several of her state-law claims, not as an independent federal law claim. The Court agrees with both Nelson and defendants that Nelson has no federal cause of action under HIPAA.") (citation omitted). Sanvee has no standing to bring a cause of action under HIPAA.   Accordingly, Sanvee's HIPAA claim (Claim 1) of the Amended Complaint should be dismissed with prejudice.[12]

### E.    Claims Under the Constitution and the Declaration of Independence

This Court finds that Sanvee's Thirteenth and Fourteenth Amendment claims (Claim 3), his claim that HCHS violated his right to domestic tranquility under the Constitution (Claim 9); and claims asserted under the Declaration of Independence (Claim 9) should also be dismissed.  While an action may be brought under 42 U.S.C. § 1983 to "vindicate rights conferred by the Constitution," a party cannot assert a direct cause of action for a constitutional violation.   Wilson v. Spain, 209 F.3d 713, 715 (8th Cir. 2000); see also Arpin v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 925 (9th Cir. 2001) ("a litigant complaining of a violation of a constitutional right does not have a direct cause of action under the United States Constitution but must utilize 42 U.S.C. § 1983."); Azul-Pacifico, Inc. v. City of Los Angeles, 973 F.2d 704, 705 (9th Cir. 1992), cert. denied 506 U.S. 1081 ("Plaintiff has no cause of action directly under the United States Constitution. . . . [A] litigant complaining of a violation of a constitutional right must utilize 42 U.S.C. § 1983.") (citing Thomas v. Shipka, 818 F.2d 496, 499 (6th Cir. 1987) ("where a plaintiff states a constitutional claim under 42 U.S.C.

---

[12]      "[I]f a plaintiff lacks standing, the district court has no subject matter jurisdiction." Faibisch v. Univ. of Minn., 304 F.3d 797, 801 (8th Cir. 2002).  HCHS did not raise the issue of a lack of a private action under HIPPA.  However, the Court can raise issues of jurisdiction sua sponte.  See Bilello v. Kum & Go, LLC, 374 F.3d 656, 659 (8th Cir. 2004) ("However, when the record indicates jurisdiction may be lacking, we must consider the jurisdictional issue sua sponte.") (citing GMAC Commercial Credit LLC v. Dillard Dep't Stores, Inc., 357 F.3d 827, 828 (8th Cir. 2004); Thomas v. Basham, 931 F.2d 521, 522–23 (8th Cir. 1991)).

§ 1983, that statute is the exclusive remedy for the alleged constitutional violation"), vacated on other grounds by 488 U.S. 1036 (1989); Hunt v. Robeson County Dept. of Social Serv., 816 F.2d 150 (4th Cir. 1987); Morris v. Metropolitan Area Transit Auth., 702 F.2d 1037 (D.C. Cir. 1983)).  Thus, Sanvee's stand-alone claims for the Thirteenth Amendment and the Fourteenth Amendment, should be dismissed without prejudice.[13]

As for Sanvee's claims for a violation of his human dignity (Claim 6) and Right of Domestic Tranquility under the United States Constitution (Claim 9), the Court finds that no such causes of action exist as a matter of law, and to the extent that Sanvee is claiming they arise under the Constitution, they should be denied for failing to seek relief pursuant to 42 U.S.C. § 1983.  Additionally, "[n]o cause of action exists for 'infringement' of the Declaration of Independence." Tompkins v. Hepp, NO. 08-CV-155-BBC, 2008 WL 2002663 at *2 (W.D. Wis. May 06, 2008).  Thus, any claim by Sanvee that HCHS was "feasting" upon his "Life, Liberty and the Pursuit of Happiness under the Declaration of Independence" (Claim 9) should be dismissed with prejudice.[14]

---

[13]   Sanvee also asserted that HCHS violated "Federal anti-slavery laws" (Claim 3), however, he failed to identify any statute that would govern such a claim.  Further, this Court notes that there was no evidence presented in the Amended Complaint to suggest that Sanvee is being subjected to slavery in violation of the Thirteenth Amendment or any federal statue.  Instead, it appears that his claims of not being paid for work performed are subsumed within his FLSA and EPA claims.

[14]   Although HCHS did not make any argument in its moving brief regarding Claims 6 and 9, the Court "has the power to sua sponte dismiss a complaint for failure to state a claim." Smith v. Boyd, 945 F.2d 1041, 1043 (8th Cir. 1991) (quoting Mildfelt v. Circuit Court, 827 F.2d 343, 345 (8th Cir. 1987) (per curiam)); Hanson v. Sullivan, (NO. 3:91-706), 1992 WL 227610 at *3 (D. Minn. June 02, 1992) (dismissing suit sua sponte for failure to state a claim where it was obvious that the plaintiff could not prevail on the facts alleged).  Along these same lines, the Court concludes that the claim of assault made in Claim 7 of the Amended Complaint should be dismissed without prejudice, even though HCHS did not address this claim, as Sanvee failed to set forth in the Amended Complaint, who committed the physical assault and what the assault entailed.  Further, Sanvee's claims under Claim 1 for "usurpation of a form" to obtain his medical records, a violation of unnamed federal and Minnesota laws prohibiting the disclosure of

F.    **Exhaustion of Administrative Remedies**

HCHS contended that the remaining claims in the Amended Complaint involving allegations of sexual abuse, sex discrimination or sexual harassment by Middlebrooks (Claim 4); allegations related to Sanvee having HIV (Claim 2); his claim for being insulted that he was on medical coverage for disabled persons instead of working at Hennepin County in 2007 constitutes a violation of the ADA (Claim 5); and allegations of violations under the FLSA (Claims 3, 8), the EPA (Claims 3, 8) and the FMLA (Claim 9) should be dismissed based on Sanvee's failure to exhaust his administrative remedies with the EEOC.  See Def.'s Mem., pp. 15-17.[15]

To assert an actionable federal employment discrimination claim, a plaintiff must exhaust all available administrative remedies, before seeking relief in the courts.  As the Eighth Circuit has explained:

> Exhaustion of administrative remedies is central to Title VII's statutory scheme because it provides the EEOC the first opportunity to investigate discriminatory practices and enables it to perform its roles of obtaining voluntary compliance and promoting conciliatory efforts.  Patterson v. McLean Credit Union, 491 U.S. 164, 180-81... (1989).  To exhaust administrative remedies an individual must: (1) timely file a charge of discrimination with the EEOC setting forth the facts and nature of the charge and (2) receive notice of the right to sue.

---

an individual's medical records and traffic of signature, and his assertions under Claim 9 that fraudulent medical records were forged on his behalf and divulged to other people outside the Hennepin County, all have no factual basis, are nonsensical, afford no relief, and should therefore be dismissed with prejudice.

[15]    HCHS also argued that Sanvee failed to raise the following claims in his EEOC charge: claims regarding his medical records, the Thirteenth Amendment violations, the violation of federal anti-slavery laws, and the violations to his human dignity. See Def.'s Mem., p. 16.  However, since the Court is recommending granting the motion for summary judgment on these claims based on different grounds – for failure to state a claim as a matter of law – the Court will not address whether the claims are also barred based on a failure to exhaust administrative remedies.

Williams v. Little Rock Municipal Water Works, 21 F.3d 218, 222 (8th Cir. 1994):

"The proper exhaustion of administrative remedies gives the plaintiff a green light to bring [an] employment discrimination claim." Shannon v. Ford Motor Co., 72 F.3d 678, 684 (8th Cir. 1996). The exhaustion requirement applies to Sanvee's sexual harassment and discrimination claims, and his ADA claims pertaining to his perceived HIV positive status, that he had been insulted for being on medical coverage for disabled persons instead of working. See 42 U.S.C. § 2000e-5; 42 U.S.C. § 12117(a); Faibisch, 304 F.3d at 803 ("Accordingly, Faibisch has not exhausted her administrative remedies with respect to the facts set forth in her complaint, and thus she cannot maintain a Title VII claim on her allegations of sex discrimination."); Randolph v. Rogers, 253 F.3d 342, 347 n. 8 (8th Cir. 2001) ("Title VII of the Civil Rights Act of 1964 and Title I of the ADA both require exhaustion of administrative remedies"); Humphrey v. Potlatch Corp., 74 F.3d 1243 (8th Cir. 1996) (per curium) (citing Weissman v. Congregation Share Emeth, 38 F.3d 1038, 1041 (8th Cir. 1994)) ("we find the district court properly granted Potlatch summary judgment on Humphrey's sexual harassment claim, given that she failed to exhaust her administrative remedies as to that particular allegation").

The Court agrees that allegations of sexual abuse, sex discrimination or sexual harassment by Middlebrooks (Claim 4); allegations related to Sanvee having HIV (Claim 2); and a claim under the ADA that he was insulted that he was on medical coverage for disabled persons instead of working at Hennepin County in 2007 (Claim 5), were never raised in Sanvee's EEOC charge (Def.'s Ex. 1).

Moreover, because it is now too late for Sanvee to file an administrative charge regarding these claims, these additional claims under the Title VII and ADA cannot now

be exhausted. See 42 U.S.C. § 2000e-5(e) (setting forth time limits for filing a charge). On this basis, these additional Title VII and ADA claims should be dismissed with prejudice for failure to exhaust.

However, it is well-settled that a claim brought pursuant to the EPA need not be administratively exhausted prior to being brought in federal court. See Ledbetter v. Goodyear Tire & Rubber Co., 550 U.S. 618, 640 (2007), superseded on other grounds by Pub.L. No. 111–2, 123 Stat. 5 (amending 42 U.S.C. § 2000e–5(e)); County of Washington v. Gunther, 452 U.S. 161, 175 n. 14 (1981)). Further, the FLSA's "enforcement scheme grants individual employees broad access to the courts . . . and no exhaustion requirement or other procedural barriers are set up, and no other forum for enforcement of statutory rights is referred to or created by the statute." Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 740 (1981). Similarly, the FMLA contains no requirement that Sanvee exhaust administrative remedies prior to bringing such a claim to Court. See Rivera v. Avis Budget Car Rental, LLC, No. 8:11–cv–1676–T–33EAJ, 2012 WL 1656907 at *5 (M.D. Fla. May 10, 2012) ("Because exhaustion of administrative remedies is not a prerequisite to an FMLA claim, the Court will address this claim separately as to Mora and Urribarri."); Mackey v. Continental Airlines, Civil Action No. H–11–4246, 2012 WL 1202045 at *5 (S.D. Tex. April 10, 2012) ("The FMLA does not require exhaustion of administrative remedies."); Wamack v. Windsor Park Manor, 836 F. Supp.2d 793, 799 (N.D. Ill. 2011) ("Indeed, Wamack was not even required to exhaust his administrative remedies before bringing an FMLA claim."); Bonzani v. Shinseki, No. CIV S–11–0007 EFB, 2011 WL 4479758 at *5 (E.D. Cal. Sept. 26, 2011) ("Contrary to defendants' argument otherwise, the FMLA enforcement provision, 29 U.S.C. § 2617, does not contain language that either explicitly or implicitly

requires a plaintiff employee to exhaust administrative remedies before filing a FMLA claim in federal court.  Rather, as discussed below, the statute provides a choice for the employee to either file suit on her own behalf, or submit a complaint to the Secretary of Labor."); Durham v. Atlantic City Elec. Co., Civil No. 08-1120 (RBK/AMD), 2010 WL 3906673, at *9 (D.N.J. Sept. 28, 2010) ("Unlike the ADA, the FMLA does not require a plaintiff to exhaust administrative remedies before filing a claim in court.") (citing 29 U.S.C. § 2617(a)); Winship v. Dakota County, NO. CIV.07-171 (JRT/FLN), 2008 WL 4151803 at *6 n.7 (D. Minn. Sept. 03, 2008) (citing Cruz-Packer v. Dist. of Columbia, 539 F. Supp.2d 181, 190 (D.D.C. 2008); Krohn v. Forsting, 11 F. Supp.2d 1082, 1085 (E.D. Mo. 1998) ("the FMLA does not require that a plaintiff first exhaust administrative remedies before proceeding to court.") (citations omitted).

Except for its exhaustion argument, HCHS offered no challenge as to Sanvee's EPA (Claims 3, 8), FLSA (Claims 3, 8) and FMLA (Claim 9) or his claim that it arbitrarily closed his COBRA medical insurance (Amended Complaint, p. 4, ¶ 8).[16]  Failing to present competent evidence and argument in support of its motion for summary judgment on Sanvee's EPA, FLSA, FMLA and COBRA-related claims is fatal to HCHS's motion on these claims.  On this basis, the Court recommends denial of the motion for summary judgment with respect to Sanvee's claims under the EPA (Claims 3, 8), FLSA (Claims 3, 8), and FMLA (Claim 9), and COBRA-related claims (Amended Complaint, p. 4, ¶ 8) stated within the Amended Complaint.

---

[16] All that HCHS presented to the Court on these claims was that they should be dismissed because Sanvee failed to serve any discovery in this case and has not provided HCHS with the name of his expert or the expert's report.  See Def.'s Mem., pp.17-20.  That is not a basis for granting summary judgment.

## RECOMMENDATION

For the reasons set forth above, it is recommended that Defendant's Motion for Summary Judgment [Docket No. 61] be GRANTED in part and DENIED in part as follows:

1.      Defendant's Motion for Summary Judgment be GRANTED as to plaintiff's claims regarding Title VII, ADA, HIPAA, Human Dignity, Declaration of Independence, usurpation of a form, violation of unnamed federal and Minnesota laws prohibiting the disclosure of an individual's medical records, traffic of signature and forgery of medical records, and violation of a right to domestic tranquility, and these claims should be DISMISSED WITH PREJUDICE.

2.      Defendant's Motion for Summary Judgment be GRANTED as to plaintiff's Thirteenth Amendment, Fourteenth Amendment, and assault claims, and these claims should be DISMISSED WITHOUT PREJUDICE.

3.      Defendant's Motion for Summary Judgment be DENIED as to plaintiff's EPA, FLSA, FMLA and COBRA-related claims within the Amended Complaint.


Dated:        August 13, 2012


*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge


Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **August 27, 2012**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within fourteen (14) days after service thereof.  All briefs filed under this Rules shall be limited to 3500 words.  A judge shall make a de novo determination of those portions to which

objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.